[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
Plaintiff, Laura Dufraine, appeals the decision of the defendant, Commission on Human Rights and Opportunities (CHRO), dismissing her complaint of sex discrimination against her employer, defendant E. J. Stephens Company. Plaintiff's complaint alleges that she was discriminated against by Stephens because of her sex, in violation of Connecticut General Statutes (C.G.S.) § 46a-60(a)(1), when he suspended her without pay for failing to notify him personally of her intent to be absent, when male employees who violated this policy were not suspended. Plaintiff later amended her complaint to add a claim of retaliation pursuant to C.G.S. § 46a-60(a)(4).
The CHRO issued a finding of no reasonable cause under C.G.S. § 46a-83(a). Plaintiff contends that the CHRO's finding is not supported by substantial evidence in the record and that the CHRO refused to consider the "great weight of the evidence." Appeal and Petition dated August 16, 1993, p. 2. Plaintiff asserts that the CHRO erred in finding no reasonable cause because a review of the evidence available to the CHRO shows that the plaintiff was treated differently than male CT Page 1238 employees and her duties and treatment changed after she filed her complaint with the CHRO.
Having reviewed the administrative record and having considered the pleadings and argument of counsel, the Court finds in favor of Plaintiff. Accordingly, for the reasons which follow, Plaintiff's appeal is sustained.
FACTS
The following facts are reflected in the record of the administrative proceedings:
Respondent, E. J. Stephens Company, located in East Hartford, Ct., is a distributor of wire, cable and tubing, (38, 170).[1] The company is owned by Edward J. Stephens (Stephens), (170). As of the filing of the instant complaint, Stephens employed 14 people, 11 males and 3 females, (38, 107-122, 170).[2] Plaintiff was hired on August 11, 1988 as a full-time accounts payable clerk, (39, 109). In 1991, after Stephens computerized his accounts payable system, plaintiff became a full-time receptionist, but maintained some accounts payable and typing duties, (39, 170). Plaintiff answered directly to Stephens, (170).
On April 2, 1992, Stephens suspended plaintiff without pay for three days after she failed to call him personally to report her absence from work on April 1, 1992, (38, 166). On April 1, plaintiff called in at 8:00 AM and told Ken Stewart, a co-worker, that she would be out sick, (41, 63). Plaintiff admits she did not call back and speak to Stephens personally, (70). Stephens contends that he suspended plaintiff pursuant to his policy which required that employees who are absent because of illness call Stephens personally at 9:00 AM (38, 166). Stephens' policy was memorialized in a memorandum to all employees dated June 26, 1991 and stated as follows:
 Effective immediately, any employee that calls in sick must call at 9:00 AM and speak with Mr. Stephens
 Failure to do so will result in three (3) days absence with no pay. (167).
If an employee failed to call Stephens, he would meet CT Page 1239 with the employee to determine why he or she had not called. If the employee had what Stephens considered to be a legitimate excuse, he would take no action, (38).
In plaintiff's case, Stephens and his accounting manager, Jim McAuliffe, met with plaintiff on April 2, 1992. Plaintiff stated that she had forgotten to call Stephens to tell him that she would be absent. However, according to Stephens, because plaintiff used a sarcastic and defiant tone of voice at the meeting, he suspended her without pay for 3 days per the June 26, 1991 memo. According to McAuliffe, Stephens got upset with plaintiff's attitude and her statement that Stephens had no rules, (38, 42, 166). Plaintiff was the first employee suspended pursuant to Stephens' policy, (166).
DISCUSSION
I. AGGRIEVEMENT
General Statutes §§ 46a-94a and 4-183 require that an appealing party be aggrieved. In the instant case, plaintiff alleged that her suspension was the result of discrimination against her by Stephens because of her sex and that Stephens retaliated against her because she filed a complaint against him with the CHRO, in violation of C.G.S. § 46a-60(a)(1) and46a-60(a)(4), respectively. The CHRO found against plaintiff and dismissed her complaint. Accordingly, the court finds j that plaintiff has a personal and legal interest in the subject matter of the CHRO's decision and has been specially and injuriously affected by it. Since aggrievement is established if there is a possibility that some legally protected interest has been adversely affected, Light RiggingCo. v. Dept. of Public Utility Control, 219 Conn. 168, 173,592 A.2d 386 (1991), this Court concludes that plaintiff is aggrieved within the meaning of C.G.S. §§ 46a-94a and 4-183.
II. STANDARD OF REVIEW
In reviewing the CHRO's decision in the instant case, the scope of the Court's review is limited. General Statutes § 4-183(f) provides that "[t]he court shall not substitute its judgment for that of the agency as to the weight of the evidence on questions of fact." "The court's ultimate duty is to decide whether, in light of the evidence, the agency has acted unreasonably, arbitrarily, illegally, or in abuse of its CT Page 1240 discretion." Connecticut Light Power Co. v. Dept. of PublicUtility Control, 219 Conn. 51, 58, 591 A.2d 1231 (1991).
"Judicial review of an administrative agency decision requires a court to determine whether there is substantial evidence in the administrative record to support the agency's findings of basic fact and whether the conclusions drawn from those facts are reasonable." Connecticut Light Power Co. v.DPUC, 216 Conn. 627, 639, 583 A.2d 906 (1990) (citations omitted). Accordingly, in the instant case, this Court must decide whether there is substantial evidence in the administrative record to support the CHRO's decision that there does not exist reasonable cause for believing that a discriminatory practice was committed as alleged in plaintiff's complaint.
Connecticut General Statutes § 46a-83 requires that the CHRO executive director refer a discrimination complaint to an investigator to investigate "and determine if there is reasonable cause for believing that a discriminatory practice has been or is being committed as alleged in the complaint." C.G.S. § 46a-83(a). The statute defines "reasonable cause" as "a bona fide belief that the material issues of fact are such that a person of ordinary caution, prudence and judgment could believe the facts alleged in the complaint." Id. The term "reasonable cause" is synonymous with the term "probable cause," which has been defined further by our courts as "a bona fide belief in the existence of facts essential under the law for the action and such as would warrant a man of ordinarycaution, prudence and judgment, under the circumstances, inentertaining it." Adriani v. CHRO, 220 Conn. 307, 316,596 A.2d 426 (1991) (citations omitted). As the court noted:
 Probable cause is a flexible common sense standard. It does not demand that a belief be correct or more likely true than false . . . . It deals with probabilities, and the application of the factual and practical considerations of everyday life on which reasonable and prudent men act.
Id., (citations and quotations omitted).
Applying the foregoing definition of "reasonable cause" to the administrative record of the instant case, the Court concludes that the CHRO's conclusion that there exists no CT Page 1241 reasonable cause for believing that a discriminatory practice has occurred as alleged in plaintiff's complaint is not supported by substantial evidence in the record.
III. THE SUSPENSION
Plaintiff does not deny that she knew of Stephens' call-in policy and that she failed to call him personally on April 1, 1992 to report her absence. She contends, however, that she was suspended for 3 days because of her sex (female), in violation of C.G.S. § 46a-60(a)(1), because male employees who similarly failed to call Stephens were not suspended per company policy. Plaintiff named George Nill, Glenn Scott, James McAuliffe and Ken Stewart as male employees who did not call Stephens when they were sick and who were not suspended, (63, 70, 185). Plaintiff further alleged that on April 2, 1992, Stewart called in sick and told plaintiff but did not call Stephens. Plaintiff believed this to be the case because, had Stewart called, plaintiff would have had to forward the call to Stephens, (63).
After investigation, the CHRO investigator made the following findings:
1.) Although plaintiff was the only employee who had been suspended as of April 2, 1992 under Stephens' call-in policy of June 26, 1991, Stephens subsequently suspended a male employee, Dennis Webb, on April 13, 1992, for failing to adhere to the policy;
2.) A male employee, George Nill, told the CHRO investigator that he had failed to follow Stephens' call-in policy regarding absences and had not been disciplined. However, Nill did not know the specific date of the absence;
3.) Another male employee, Glenn Scott, told the CHRO investigator that he may have failed to call Stephens when he was absent, but he could not be certain if the call-in policy was in effect at the time; and
4.) Another male employee, Ken Stewart, verified to the CHRO investigator that he did not call Stephens when he was absent, but Stephens spoke to him about it, (11).
Apparently the CHRO investigator gave no weight to the CT Page 1242 statements made by Nill, Scott and Stewart that they had failed to call Stephens personally to inform him of their absences and had not been suspended because they could not be specific as to when they were absent, (11, 47, 58-59). With respect to Nill, however, company attendance records reflect that he was out sick on March 16, 1992, during the time the policy was in effect and approximately three weeks before plaintiff was suspended, (117). Glenn Scott could not be sure if the call-in policy was in effect when he was absent and failed to telephone Stephens. While company attendance records do not reflect that Scott was out sick from January 1, 1992 until April 1, 1992, (111), the CHRO investigator failed to review attendance records from June 26, 1991, the day the policy was initiated, to December 31, 1991 to see if Scott had been out sick while the policy was in effect.
Ken Stewart verified that on one occasion, around the time plaintiff was suspended, he was out sick and did not personally call Stephens as required by company policy (11). Stewart stated that Stephens spoke to him about the absence but took no disciplinary action against him. Indeed, Stewart stated that Mr. Stephens asked him to lie if he were asked why he had not called Stephens back, i.e., that he was in the dentist chair, (52). Company attendance records reflect that Steward was out sick on April 2, 1992, the same day plaintiff was suspended, as well as on January 20 and 21, 1992, (116).
Moreover, the CHRO investigator failed to make any findings concerning plaintiff's allegation that employee Jim McAuliffe had failed to personally telephone Stephens when McAuliffe was absent. McAuliffe verified to the investigator that he had failed to call Stephens and that Stephens gave him an oral warning. However, McAuliffe was of the opinion that he was not similarly situated as plaintiff because he was, as the accounting manager, a management person, (41, 43). McAuliffe's belief, however, is unsupported by any evidence in the record. On the contrary, the June 26, 1991 memo is addressed to "All E.J. Stephens Employees," and was initialled by McAuliffe. It does not exclude management employees. Moreover, if the policy did not apply to McAuliffe, there would have been no reason for Stephens to give McAuliffe an oral warning for failing to call him.
Both the investigator in his Finding of No Reasonable Cause and Summary (11) and the CHRO in its brief assert that CT Page 1243 plaintiff was not the only employee suspended pursuant to the call-in policy. Stephens submitted time sheets and a pay stub to the investigator which reflected that on April 13, 1992, a male employee named Dennis Webb was suspended for three days (April 14-16, 1992) for failing to adhere to the call-in policy. However, the investigator never interviewed Webb to determine the reason for the suspension, that is, to determine whether Webb had been suspended for failing to call Stephens or because he had a sarcastic or defiant attitude upon his return to work, as had been the case with plaintiff. Had the investigator contacted Webb, he might have been able to establish whether Webb's suspension was legitimate or an attempt by Stephens to protect himself against a discrimination claim by plaintiff. Accordingly, having failed to interview Webb, there is no basis in the record for concluding that Webb was in the same position as plaintiff or that Webb's suspension demonstrates that the suspension policy was not discriminatorily applied as to plaintiff because of her sex.
It is apparent from the foregoing and from a review of the present case, that the CHRO failed to discharge its obligation of conducting a thorough and complete investigation and failed to consider all reliable and probative proof as required by law. As our Supreme Court has stated:
 "[T]he power of the commission, through its investigators, to make findings of material facts as part of the reasonable cause determination, and the trial court's obligation to review such findings under the substantial evidence standard, is conditional upon the commission having conducted a thorough investigation of the claim and having relied only upon reliable, probative evidence in making those findings. In undertaking its investigation, the commission is obligated to pursue evidence corroborating, as well as contradicting, the plaintiff's complaint.
Adriani v. CHRO, supra, 220 Conn. at 319.
Such an inquiry was not made in the instant case. In addition to failing to interview Webb, an important witness, the investigator interviewed plaintiff's witnesses in CT Page 1244 Stephens' presence. McAuliffe was interviewed with Stephens present during part of the interview, (41). The record does not indicate during which part of the interview the investigator was alone with the witness. Another employee, Lynn Lamesa, a relevant witness regarding plaintiff's claim of retaliatory treatment by Stephens, was interviewed with Stephens present during the entire interview, (43-44). When employees are interviewed about acts of discrimination by their employer, in their employers presence, their candor is put into question, since an employee is not likely to want to offend his boss and jeopardize his job. Query why this method of interview as utilized in this case.
Moreover, company attendance reports reflect that from January 1 to April 2, 1992, other employees were out sick but the investigator never interviewed them to determine whether they had adhered to the call-in policy. For example, Lynn Lamesa was out sick January 27-31, 1992, February 25 and 7, 1992, and March 23, 1992, (110).[3] Yet, the investigator never asked when he interviewed her whether she adhered to the call-in policy. An employee by the name of R. Wallace was absent on March 27, 1992 and was not interviewed by the investigator (115). An employee by the name of J. Leone was out sick on January 6 and 7, 1992 and was never interviewed by the investigator (118). In addition, the investigator failed to examine company attendance records from June 26, 1991 to December 31, 1991 to determine who was out sick during the pendency of the call-in policy and whether the policy had been adhered to.
Although the Court notes that the CHRO investigation was not thorough and complete, the Court need not remand this case for further investigation by the CHRO because the CHRO's no reasonable cause finding is not supported by substantial evidence in the administrative record as it already exists. The evidence in the record reflects that 4 male employees, out of a total of 14 employees, admitted failing to adhere to the call-in policy. That policy, as is reflected clearly in the June 26, 1991 memo addressed to all employees, states that "Failure to do so [call at 9:00 AM and speak with Mr. Stephens] will result in three (3) days absence with no pay," (167) (emphasis added). It does not say that suspension was discretionary, or that it might result if Stephens felt the reason for the absence was not legitimate, or if the employee demonstrated a bad attitude when interviewed upon return to CT Page 1245 work.
The record reflects that in all instances where male employees violated the call-in policy, Stephens accepted the explanations for their absences. The only explanation not accepted was plaintiff's, a female, although she had a legitimate reason for her absence, i.e., she was sick. This evidence constitutes reasonable cause to believe that plaintiff's suspension was a result of a discriminatory application of the call-in policy, in violation of the law.
IV. RETALIATION
Additionally, plaintiff alleges that from April 30, 1992, the day Stephens received her complaint from the CHRO, Stephens retaliated against her for having filed it, in violation of C.G.S. § 46a-60(a)(4). According to plaintiff, Stephens yelled at her daily, called her "dense," threatened to fire her for not performing her job correctly, and changed her job duties, (39, 54-57, 63-64, 71). Plaintiff quit her job on June 25, 1992, without notice to Stephens, allegedly because of Stephens' retaliatory treatment, (57, 71, 109).
With respect to plaintiff's claim of retaliation, the CHRO concluded that Stephens did not retaliate against plaintiff for filing her complaint, (10). This conclusion, however, is not supported by substantial evidence in the record. Rather, the record reflects that Stephens treated plaintiff differently and badly after she filed her complaint with the CHRO. The CHRO investigator found that prior to her suspension, Stephens treated plaintiff more favorably because Stephens yelled, and swore at other employees, both male and female, but not at plaintiff, (10).[4] According to the CHRO, that Stephens yelled and swore at plaintiff after she filed her complaint did not support an inference of retaliatory treatment because Stephens was merely doing to plaintiff what he did to his other employees; that is, he treated her as badly as he did them. The investigator's logic, however, misses the mark. The fact remains that Stephens treated plaintiff well before she filed and badly after she filed. A reasonable inference to be drawn from Stephens' conduct, therefore, is that he was retaliating against plaintiff because she filed a complaint with the CHRO.
The CHRO also found that although Stephens criticized CT Page 1246 plaintiff's performance more after she filed her CHRO complaint, (10), it was not done to retaliate. This conclusion is not supported by facts in the record either. Ken Stewart described Stephens' actions as "nit picking her [plaintiff's] work" (52), and the evidence supports this characterization of Stephens' conduct. The record reflects that on April 30, 1992, the day he learned of plaintiff's complaint, Stephens ordered her not to let the telephone rings more than three times, (39, 54). Additionally, Stephens directed Lynn Lamesa, a co-employee, the day before plaintiff quit, to write him a letter to document that plaintiff, contrary to his orders, allowed the telephone to ring more than three times. Lamesa stated that "Stephens asked her if she was having problems with the complainant and what these problems were," (43).[5] So, she wrote him the memo on June 23, 1992.
On May 4, 1992, plaintiff was written up for failing to post backlogged invoices since February 1992, (39-40, 54, 82, 87). This transgression, however, was not discovered as a direct consequence of failing to post the backlog, but because Stephens took this duty away from plaintiff and gave it to McAuliffe. This is another instance where Stephens changed plaintiff's work duties after she filed her CHRO complaint, (82, paragraph 1).
On May 7, 1992, Stephens criticized plaintiff for answering the telephone in a curt manner, although he could name no one in particular who had made a complaint, (40, 54). On May 11, 1992, Stephens prohibited plaintiff from distributing the mail in McAuliffe's absence. Plaintiff was told not to open the mail until McAuliffe and Stephens had okayed it, (54). Again, Stephens changed plaintiff's work duties.
On May 13, 1992, co-worker Glenn Scott was reprimanded for speaking to plaintiff. Plaintiff alleged that Stephens called Scott into his office and told him he was no longer allowed to talk to plaintiff and that Stephens could fire Scott for it, (54). Scott told the CHRO investigator that Stephens had told him to stop spending so much time talking with plaintiff, (45). Scott added that Stephens told him he could be suspended, but Scott did not recall Stephens saying he could be fired, (id.). When asked about the incident by the CHRO investigator, Stephens only denied saying that he CT Page 1247 threatened to fire Scott if he continued to talk to plaintiff, (40).
On May 21, 1992, Stephens yelled and cursed at plaintiff for interrupting a conversation he was having with Lynn Lamesa, (54). Stephens admitted that this incident had occurred, (40). The investigator, however, did not mention it to Lamesa when he interviewed her, (43-44). Additionally, on May 26, 1992, Stephens reprimanded plaintiff for omitting an "s" at the end of a caller's name on a phone message, (55). Although Stephens denied he made the remarks alleged by plaintiff, (40), the CHRO investigator did not ask to see the message to see whether it corroborated plaintiff's allegation.
On May 27, May 28, May 29, 1992, Stephens chastised plaintiff for the way she directed incoming calls, (55). The CHRO investigator, however, never mentioned these incidents to Stephens, even though plaintiff alleged that Stephens took a rolodex card out of her hand, tore it up and threw it away and allegedly stated: "get back to your desk, sit down and do your job! Who the hell do you think you are! What are you dense?!!" (55). That the investigator omitted this incident when he spoke to Stephens is inexcusable since calling plaintiff "dense" was a major allegation in plaintiff's amended complaint, (71, paragraph 8).
On June 15, 1992, Stephens discovered that plaintiff had incorrectly issued a debit memo, although plaintiff claimed she had been doing them the same way since she was hired. According to plaintiff, Stephens stated, "I'll have to discuss this with Jim and take these away from you, too," (56). The CHRO investigator also failed to mention this incident to Stephens.
On June 16, 1992, Stephens yelled at plaintiff for misspelling someone's name on a telephone message, (56). He also reprimanded her for placing the attention line too high on an envelope (id.). Plaintiff alleged that Stephens tore up the envelope and threw it away, (id.). Again, the CHRO did not ask Stephens about either of these incidents when he interviewed him on May 6, 1993.
On June 24, 1992, Stephens reprimanded plaintiff for telling him that someone from GKA rather than BKM was on the telephone, (57). Plaintiff alleged that Stephens told her CT Page 1248 that, "If you can't do your job right, we'll find someone who can! I've taken too many bullshit calls from you!!" (Id.). When the CHRO investigator asked him about this incident, Stephens did not deny it. He stated that "he had a right to speak to his employees if they weren't doing their job right," (40).
Furthermore, the CHRO found that plaintiff's claim that Stephens removed some of her job duties after she filed her complaint was true. The CHRO, however, found that Stephens had a legitimate reason for his actions in that the reports contained financial information which Stephens considered sensitive, and Stephens feared that, because plaintiff had filed a discrimination complaint against him, she would alter them or disclose the information, (10). Stephens stated that plaintiff "was doing confidential reports for the salesman and for him," and that he "considered this as a potential conflict of interest especially since [plaintiff] had just filed a complaint against him," (39). McAuliffe, however, stated that the reports were taken away from plaintiff because she did not have time to do them and they were not being done, (42). He made no mention of concerns about confidentiality. Indeed, the record contains no evidence that Stephens considered these reports to be confidential before plaintiff filed her CHRO complaint. For instances, there is no indication that access to the reports was restricted or that plaintiff was pledged to secrecy regarding the information contained therein. Rather, the evidence demonstrates that the task of preparing the reports was taken away from plaintiff merely because she filed her CHRO and that action by Stephens support an inference of retaliation against plaintiff.
Lastly, the CHRO found against plaintiff in her retaliation claim because she "did not always perform well on the job as claimed," (11). This conclusion is based upon the facts that plaintiff received various written warnings from her previous supervisor, that subsequent to plaintiff quitting, McAuliffe discovered that plaintiff had failed to post backlog and cancelled invoices, and that plaintiff had punched in early on at least one occasion, (id.) Additionally, the CHRO determined that Stephens had spoken to plaintiff about her work performance on a number of occasions and that at least one co-worker, Lynn Lamesa, had written a letter to Stephens about plaintiff's failure to answer the telephone within three rings, (id.). CT Page 1249
These conclusions by the CHRO also are not supported by the evidence in the record of this case. Prior to filing her complaint, Stephens considered plaintiff to be a good employee. According to Stephens, she had not been disciplined in any manner previously, (41, 166). In his response to plaintiff's complaint dated May 11, 1992, Stephens stated that "[t]he work performed by the complainant was satisfactory and compared equally to co-workers," (170). Additionally, Stephens stated "complainant knew her work was satisfactory because she received yearly raises", (171). Stephens further stated that the "complainant was treated by the respondent in a favorable manner; i.e., additional responsibility and raises," (id.). Moreover, on May 6, 1993, Stephens told the CHRO investigator that plaintiff "did a good job in the receptionist job, and respondent gave her three raises in the third and fourth quarter [sic] of 1991," (39).
Indeed, only two negative notes were in plaintiff's personnel file prior to the filing of her CHRO complaint. One was a memo dated 10-6-88 by plaintiff's supervisor at the time, Lucille Vernali, who complained about plaintiff's attitude and failure to accept direction from her, (73-74). This memo, however, could not have motivated Stephens' conduct toward plaintiff after she filed her complaint because, as Stephens admits, he gave plaintiff additional responsibilities and raises as late as the third quarter of 1991. The other negative memo about plaintiff, prepared by Jim McAuliffe, is dated March 30, 1992 and concerns allegations that plaintiff was punching in early without authorization, (81). The memo states that McAuliffe reviewed time cards for a couple of months and found that plaintiff had punched in early on numerous occasions without authorization, (id.). Once again, the CHRO investigator failed to ask any of the interested parties about this memo. Therefore, we do not know how, after months of occurring, plaintiff's conduct was discovered or why the memo was written, particularly since McAuliffe, as the accounting manager, must have been responsible for paying plaintiff for the extra time. Given the investigator's incomplete inquiry regarding this memo, its evidential weight is minimal.
As previously noted, the CHRO concluded that Stephens "may have criticized complainant's performance more after she filed," (10). However, Stephens did not complain about CT Page 1250 plaintiff's work at all before the filing of the complaint. Most of the evidence of poor work performance was created after plaintiff filed her complaint. While Jim McAuliffe stated that plaintiff's attitude changed after she moved to the receptionist position and before her suspension, (41), nothing in plaintiff's personnel records supports his views.
Additionally, Stephens' December 6, 1992 letter to the CHRO investigator wherein he states that "for over 3 years, in spite of the support of supervisors, employees, and the respondent, ongoing training, changes in responsibilities and improvements for handling complainant's workload, she [plaintiff] failed to respond to the requirements and functions of co-worker and the company," (125), contradicts his sworn statements to the contrary. The record clearly reflects that prior to her suspension, plaintiff was considered a satisfactory employee, was not written up for poor work performance and received regular raises.
In summary, then, the totality of evidence in the administrative records of this case reflects that Stephens retaliated against plaintiff for filing a complaint with the CHRO. Stephens' behavior was observed by other employees who confirmed that "just before Ms. Dufraine left E.J. Stephens employ, Mr. Stephens started to treat her differently (i.e., taking away job duties, nit picking her work)," (52). Another employee noted that plaintiff was "distraught, and couldn't take it any more," and that "Mr. Stephens treated complainant badly, and the treatment worsened after she filed," (58). This employee noted that "Mr. Stephens like to treat people like dirt and tried to get them to quit," (i.d.). These opinions are supported by the evidence in this case and a reasonable conclusion to be drawn is that after Stephens learned she had filed a sex discrimination complaint against him, he no longer wanted plaintiff in his employ and took steps to make her life miserable at work.
CONCLUSION
Having reviewed the totality of evidence in this case, the Court finds that the CHRO erred in its finding of no reasonable cause for believing that a discriminatory practice occurred as alleged in plaintiff's complaint. The evidence clearly demonstrates that plaintiff was the first employee CT Page 1251 ever suspended pursuant to Stephens' call-in policy, although four male employees admitted violating it prior to plaintiff. While a male employee was suspended approximately ten days after plaintiff, allegedly for violation of the policy, there is no basis in fact for concluding that he was similarly situated as plaintiff because the CHRO investigator never interviewed him. Rather, the investigator merely accepted Stephens' representations in this regard and failed to investigate the incident any further.
With respect to the retaliation claim, the CHRO found that plaintiff was treated differently by Stephens, that Stephens criticized her work more and changed her job duties after she filed her complaint. Nevertheless, the CHRO concluded that Stephens conduct was not motivated by discriminatory intent, but by legitimate reasons. The investigator found in favor of Stephens because he merely treated plaintiff the same as he did his other employees, albeit badly. However, there is no evidence in the record about how Stephens treated other employees because the investigator did not interview all employees, and the ones he did interview never said Stephens treated them badly. Moreover, that Stephens treated plaintiff after she filed as badly as he did his other employees is not legal justification for his conduct and does not negate an inference of discriminatory treatment of plaintiff.
In summary, this Court finds that the CHRO used a higher standard than reasonable cause to review the evidence in this case. In effect, the CHRO required plaintiff to establish aprima facie case during the investigative stage, which is contrary to law. Adriani v. CHRO, supra, 220 Conn. at 315-316. Moreover, the CHRO's conclusions were based upon an incomplete investigation and after the investigator made credibility assessments by interviewing witnesses in Stephens' presence and other key witnesses (Nill and Stewart) by telephone and letters, rather than in face-to-face, give-and-take interviews.
Therefore, the Court further finds that, contrary to the CHRO's conclusions, substantial evidence in the record reflects that there exists a bona fide belief that material issues of fact are such that a person of ordinary caution, prudence, and judgment could believe that Stephens discriminated against plaintiff because of her sex when he CT Page 1252 suspended her on April 2, 1992 and that he retaliated against her after she filed a complaint against him with the CHRO. Additionally, the Court finds that there does not exist substantial evidence in the administrative record to support the CHRO's finds of basic fact and the conclusions drawn from those facts by the CHRO are not reasonable. In finding no reasonable cause, the CHRO abused its discretion by refusing to consider the great weight of the evidence in plaintiff's favor.
Accordingly, plaintiff's appeal is sustained and this case is hereby remanded for hearing before a hearing officer, pursuant to C.G.S. § 46a-84.
IT IS SO ORDERED.
Dated at Hartford, Connecticut, this 8th day of February, 1995.
BY THE COURT
Espinosa, J.